IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LINDSEY N. SNAY, | ) | CASE NO. 3:25-CV-00868-JRK |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES R. KNEPP, II |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | MAGISTRATE JUDGE |
| ADMINISTRATION, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Lindsay N. Snay ("Plaintiff" or "Snay"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In April 2022, Snay filed an application for POD and DIB, alleging a disability onset date of August 18, 2018, and claiming she was disabled due to bulging discs in her neck and back, PTSD, anxiety, paranoia, fibromyalgia, chronic neck and back pain, borderline personality disorder, mental issues, voices, and numbness and tingling in her arm and hand.  (Transcript ("Tr.") 122, 123, 255.)  The applications were

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

1

denied initially and upon reconsideration, and Snay requested a hearing before an administrative law judge ("ALJ"). (*Id*. at 161.) At the hearing, Snay amended her alleged onset date to May 4, 2021. (*Id*. at 60-61.)

On July 20, 2023, an ALJ held a hearing, during which Snay, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id*. at 55-83.) On March 27, 2024, the ALJ issued a written decision finding Snay was not disabled. (*Id*. at 11-33.) The ALJ's decision became final on March 10, 2025, when the Appeals Council declined further review. (*Id*. at 1.)

On May 1, 2025, Snay filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 7, 9, 10.) Snay asserts the following assignments of error:

1) The ALJ erred at step three when failing to explain why the opinions of Dr. Soder and NP Asong did not satisfy the requirements of the medical listings, and the ALJ's step three finding is unsupported by substantial evidence. The ALJ's mental residual functional capacity finding is unsupported by substantial evidence based upon her failure to follow the revised regulations when evaluating the persuasiveness of the medical opinions and prior administrative medical findings.

2) The ALJ erred in her analysis of the opinions of CNP Crook and Dr. Onamusi and the prior administrative medical findings pursuant to the revised regulations, and the physical residual functional capacity finding is unsupported by substantial evidence.

(Doc. No. 7 at 1.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Snay was born in 1978 and was 45 years-old at the time of her administrative hearing (Tr. 55, 122), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education. (Tr. 31.) She has past relevant work as an inventory control clerk, a forklift operator, and a plastic injection molder. (*Id*.)

2

**B.      Relevant Medical Evidence[2]**

On June 10, 2021, Snay presented for a telehealth appointment with Dr. Soder. (*Id*. at 489.) She attended with her husband. (*Id*.) She reported she is improving, feeling a benefit from her medication. (*Id*.) She complained of back and hip pain and stated her physical concerns are her biggest limitation. (*Id*.) Her disability denial made her feel worthless because she wanted to contribute in some way. (*Id*.) She worked in the past by herself, and little things would trigger rage. (*Id*.) She reported experiencing less hallucinations, some trouble with sleep, and trouble with focus. (*Id*.) Mental status exam revealed she was alert, focused, cooperative, good eye contact, normal speech, euthymic mood, full affect, goal-directed thought process, hallucinations, good insight, and intact judgment. (Id. at 490.) Her medications were adjusted. (*Id*.)

On July 29, 2021, Snay presented for a telehealth appointment with Dr. Soder. (*Id*. at 466.) She attended with her husband. (*Id*.) Her husband provided most of the information as Snay had a "breakdown" yesterday and hid out of view for most of the appointment. (*Id*.) She reported the voice in her head talks non-stop. (*Id*.) She feels crazy, going from fine to depressed "at the flip of a switch". (*Id*.) Mental status exam revealed she was alert, focused, guarded, avoidant eye contact, normal speech with anxious tone, fearful and anxious mood, limited affect, goal-directed thought process, auditory hallucinations, good insight, and intact judgment. (*Id*. at 467.) Her medications were adjusted. (*Id*.)

On August 17, 2021, Snay presented for a telehealth appointment with Dr. Soder. (*Id*. at 457.) She attended with her husband. (*Id*.) She reported she is improving, feeling better overall, named the voice in her head "Marsha" and no longer hears her 24/7, feels less irritable, takes medication if she is going to be around other people, feels confused at times and sometimes drops things. (*Id*. at 457-58.) Mental status exam revealed she was alert, focused, cooperative, good eye contact, agitation in the form of fidgeting with

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

her hair, normal speech, "emotional but better than before", limited but brighter than prior affect, goal-directed thought process, auditory hallucinations, good insight, and intact judgment. (*Id*. at 458.) Her medications were adjusted. (*Id*.)

On October 6, 2021, Snay presented for a telehealth appointment with Dr. Soder. (*Id*. at 451.) She attended with her husband. (*Id*.) She reported she is stable. (*Id*.) She reported doing ok, obsessing over "everything", and medication has helped quiet "Marsha" down. (*Id*.) Mental status exam revealed she was alert, focused, cooperative, good eye contact, normal speech, euthymic mood, limited, mood congruent, "social smile present" affect, goal-directed thought process, auditory hallucinations have improved, good insight, and intact judgment. (*Id*. at 452.) Her medications were adjusted. (*Id*.)

On December 9, 2021, Snay presented for a telehealth appointment with Dr. Soder. (*Id*. at 443.) She attended with her husband. (*Id*. at 444.) She reported feeling more depressed, having "past thoughts" of wanting to hurt the people who have hurt her, and improvement in hearing the voice of Marsha. (*Id*.) Mental status exam revealed she was alert, focused, cooperative, good eye contact, normal speech, dysphoric mood, limited, mood congruent, "social smile present" affect, goal-directed thought process, auditory hallucinations, good insight, and intact judgment. (*Id*.) Her medications were adjusted. (*Id*.)

On January 14, 2022, Snay presented via referral for an appointment to address her chronic low back pain and fibromyalgia. (*Id*. at 438.) She was advised to continue her medications, and she elected to proceed with medial branch blocks injections. (*Id*. at 442.)

On February 8, 2022, Snay presented for a telehealth appointment with Dr. Soder. (*Id*. at 435.) She attended with her husband. (*Id*. at 436.) She reported she is stable. (*Id*.) She reported feeling tired, potentially because she ran out of her medication, she has emotional days, and she still hears "Marsha" a voice in her head. (*Id*.) Mental status exam revealed she was alert but appeared tired, focused, cooperative, good eye contact, normal speech rate with "somewhat down tone", dysphoric mood, limited, mood congruent, "social

4

smile present" affect, goal-directed thought process, auditory hallucinations, good insight, and intact judgment. (*Id*.)

On March 16, 2022, Snay presented for a planned confirmatory medial branch blocks to address her chronic low back pain. (*Id*. at 414.) She was advised on post-procedure care. (*Id*.)

On March 28, 2022, Snay presented to a follow-up appointment for chronic low back pain. (*Id*. at 405.) She received a lumbar medial branch block on March 16, 2022 and had one hundred percent pain relief for two days. (*Id*.) She reported significant improvement in her range of motion and ability to stand on her feet for a longer period of time without pain. (*Id*.) She has not taken any medication during this time and was ready to proceed with ablation therapy. (*Id*.) She was advised to continue her medications and see a physical therapist. (*Id*. at 409-10.)

On April 13, 2022, Snay presented for a telehealth appointment with Dr. Soder. (*Id*. at 402.) She attended with her husband. (*Id*. at 403.) She reported not doing well, feeling "super" depressed, stated the "voice of Marsha is back", and feels hopeless. (*Id*.) Mental status exam revealed she was alert, focused, cooperative, had good eye contact, normal speech rate and "down tone", "super depressed" mood, limited, mood congruent, "slight social smile" affect, goal-directed thought process, auditory hallucinations, good insight, and intact judgment. (*Id*.) Her medications were adjusted. (*Id*. at 404.)

On April 26, 2022, Snay presented for a follow-up appointment for chronic low back pain. (*Id*. at 389-90.) She noted still having pain on her left side. (*Id*. at 390.) She also experiences some numbness in her arms and hands. (*Id*.) She proceeded with thermal radiofrequency ablation on the left side. (*Id*. at 393.) She was advised to see a physical therapist. (*Id*. at 393.)

On June 14, 2022, Snay presented for a follow-up appointment for chronic low back pain and fibromyalgia. (*Id*. at 370.) She completed a "bilateral lumbar RFA" and noted significant improvement in her pain. (*Id*. at 371.) She still has some pain with bending or first thing in the morning. (*Id*.) The physician

reviewed past MRI results indicating degenerative changes in the spine with shallow disc bulges. (*Id*. at 372.) Her diagnoses include lumbar spondylosis, lumbar facet joint pain, and myofascial pain. (*Id*. at 373-74.) She was referred to complete lumbar radiofrequency ablation, and physical therapy, but she declined physical therapy. (*Id*. at 374.)

On June 16, 2022, Snay presented for a telehealth appointment with Dr. Soder. (*Id*. at 368.) She attended with her husband. (*Id*. at 369.) She reported being more tearful and anxious lately, but her rage was under control. (*Id*.) She reported still hearing the voice of Marsha in her head. (*Id*.) She had 3 EMDR therapy sessions and declined therapy for now. (*Id*.) Mental status exam revealed she was alert, focused, cooperative, had good eye contact, normal speech rate with somewhat anxious tone, anxious and dysphoric mood, limited, mood congruent affect, goal-directed thought process, auditory hallucinations, good insight, and intact judgment. (*Id*.) Her medications were adjusted. (*Id*. at 369-70.)

On October 19, 2022, Snay presented for a telehealth appointment with Dr. Soder. (*Id*. at 1443.) She attended with her husband. (*Id*. at 1444.) She reported feeling "really depressed lately" and more tearful. (*Id*.) Her disability was denied, which "really depress[ed] her", she feels she was denied due to her age, and the denial makes her feel like a burden. (*Id*.) Her husband notes "she does a lot around the house." (*Id*.) Her anxiety fluctuates, she hears "Marsha" non-stop but notes hallucinations are improved overall. (*Id*.) Much of the appointment was spend in psychotherapy. (*Id*.) Mental status exam revealed she was alert, focused, cooperative, good eye contact, normal speech with normal rate and "down tone", "really depressed" mood, limited, mood congruent, tearful affect, goal-directed thought process, auditory hallucinations, good insight, and intact judgment. (*Id*. at 1444-45.) Her medications were adjusted. (*Id*. at 1445.)

On October 27, 2022, Snay presented for a follow-up visit for chronic back pain and fibromyalgia with Ashton Crook, APRN-CNP. (*Id*. at 1435.) She reported having good and bad days, "but overall manageable." (*Id*.) Physical exam revealed no acute distress, no joint swelling or gross deformity, 5/5

6

strength globally and symmetrically, normal affect and mood, normal thought process without evidence of depression or psychosis, good insight and appropriate interaction, and intact cognition and memory. (*Id*. at 1441.)

On November 22, 2022, Snay presented for a follow-up visit for chronic back pain and fibromyalgia with Ashton Crook, APRN-CNP. (*Id*. at 1428.) She reported medication helping "some", denied side effects, reported good and bad days, and she reported "looking at getting on disability for both physical". (*Id*.) She endorsed hallucinations, anxiety, depression, suicidal ideation, and gait problems. (*Id*. at 1432.) Physical examination revealed no acute distress, no joint swelling or gross deformity, 5/5 strength globally and symmetrically, normal affect and mood, normal thought process without evidence of depression or psychosis, good insight and appropriate interaction, and intact cognition and memory. (*Id*. at 1433.) Her medications were managed, and she was referred for physical therapy. (*Id*. at 1434.) She received counseling on exercise and medication adherence. (*Id*.)

On December 20, 2022, Snay presented for a follow-up visit for chronic back pain and fibromyalgia with Ashton Crook, APRN-CNP. (*Id*. at 1417.) She reported medication helping, denied side effects, and felt "pain is manageable." (*Id*.) She endorsed hallucinations, anxiety, depression, suicidal ideation, and gait problems. (*Id*. at 1421.) Physical exam revealed no acute distress, no joint swelling or gross deformity, 5/5 strength globally and symmetrically, normal affect and mood, normal thought process without evidence of depression or psychosis, good insight and appropriate interaction, and intact cognition and memory. (*Id*. at 1422.) Her medications were managed and she was provided counseling on healthy eating habits, exercise, substance abuse, and healthy sleep habits. (*Id*. at 1423.)

On January 6, 2023, Ashton Crook, CNP, completed a Residual Functional Capacity Questionnaire – Physical, attaching a Functional Capacity Evaluation ("FCE") completed on January 5, 2023 completed by Michael Salerno, PT. (*Id*. at 1491-98.) The FCE noted MRIs in 2020 and 2021 revealed "mild

7

degenerative changes" and bulging discs. (*Id*. at 1493.) Her neck range of motion was noted as "moderate restriction; tight" and trunk range of motion was noted as "major restriction; painful and tight". (*Id* at 1494.) Upper extremity strength was rated in a rage from 3- to 4 out of 5. (*Id*. at 1495.) Lower extremity strength was rated in a range from 4- to 4 out of 5. (*Id*.) Her grip strength and pinch strength were both below average. (*Id*.) The provider opined Snay falls within the sedentary work classification. (*Id*. at 1496.)

On March 30, 2023, Snay presented for a telehealth appointment with Ashton Crook, APRN-CNP. (*Id*. at 1604.) She attended with her husband. (*Id*.) She reported not doing well and wanting to change her medications. (*Id*.) She stated her mood is down and she feels anxious. (*Id*.) She has trouble leaving the house and interacting with others. (*Id*.) She experiences "blackouts" every couple of weeks. (*Id*.) Mental status exam revealed she was alert, focused, operative, good eye contact, normal speech with down tone, anxious and dysphoric mood, limited, mood congruent affect, goal-directed thought process, auditory hallucinations, good insight, and intact judgment. (*Id*. at 1604-5.) Her medications were adjusted. (*Id*. at 1605.)

On April 3, 2023, Angela Soder, M.D. completed Residual Functional Capacity Questionnaire – Mental. (*Id*. at 1550-51.) Dr. Soder wrote Snay was diagnosed with post traumatic stress disorder, anxiety, mood disorder, and dissociation psychosis, unspecified. (*Id*. at 1550.) Dr. Soder wrote she first saw Snay on February 18, 2021 and saw her every 1-2 months since then. (*Id*.) Clinical findings include anxiety, depression, panic, auditory hallucinations, dissociates from reality, limited affect, depressed tone of speech, and tearfulness. (*Id*.) Dr. Soder indicated Snay has marked difficulties in understanding, remembering, or applying information, and maintaining concentration, persistence, or pace. (*Id*.) Dr. Soder indicated Snay has extreme difficulties interacting with others and adapting or managing oneself. (*Id*.) Dr. Soder anticipated Snay would be absent from work four or more days per month. (*Id*.) Dr. Soder opined Snay had marked limitations in ability to remember locations and work-like procedure, ability to complete an 8-hour workday and workweek without interruptions from symptoms, and ability to get along with coworkers. (*Id*. at 1551.)

8

Dr. Soder indicated Snay had a moderate limitation in ability to carry out very short and simply instructions, and an extreme limitation in the ability to respond to change. (*Id*.) Dr. Soder wrote Snay has a "history of trauma/PTSD with high anxiety, panic attacks, trouble leaving the house alone, trouble with change, will take days to recover and return to baseline." (*Id*.) Dr. Soder indicated Snay has cognitive issue with focus and memory and trouble with social interactions which trigger panic. (*Id*.)

On June 22, 2023, Snay presented for a follow-up appointment with Ashton Crook, APRN-CNP for chronic pain and "fibro". (*Id*. at 1608.) She reported nerve blocks helped but it wore off and she didn't want to go back, and she ran out of a medication because she forgot about it. (*Id*.) She reported not doing well because she has a disability hearing which is making her anxious. (*Id*.) Her depression changes day to day. (*Id*.) She reported her medications helping a little bit. (*Id*.) She has suicidal thoughts 1-2 times per month. (*Id*.) She hears voices in her head. (*Id*.) Her medications were adjusted. (*Id*. at 1609, 1612.) She was counseled on exercise and medication adherence. (*Id*. at 1613.)

On July 12, 2023, Snay presented for a telehealth appointment with Ashton Crook, APRN-CNP. (*Id*. at 1614.) She attended with her husband. (*Id*.) She reported feeling stressful, overly emotional, pain in her back, experiencing suicidal thoughts but did not think inpatient treatment was necessary, noted that EMDR therapy worked, but did not want to continue therapy. (*Id*.) Much of the appointment was spent in psychotherapy. (*Id*.) Mental status exam revealed she was alert but looked tired, focused, cooperative, good eye contact, normal speech with down tone at times, dysphoric "overly emotional" mood, limited, mood congruent affect, goal-directed thought process, auditory hallucinations, good insight, and good judgment. (*Id*. at 1614-15.) Her medications were adjusted. (*Id*. at 1615.)

On August 31, 2023, Snay was evaluated for a Medical Source Statement of Ability to do Work-Related Activities. (*Id*. at 1616-21.) The Muscle Evaluation revealed five out of five muscle strength for all muscle groups. (*Id*. at 1617-18.) The Range of Motion Report Form revealed decreased range of motion of

9

the cervical spine, lumbar spine, and shoulders. (*Id*. at 1619-20.) Straight leg raise was negative bilaterally and she walked with a normal gait. (*Id*. at 1621.) Dr. Onamusi's evaluation report opined Snay could sit for 35 minutes, stand for 15 minutes, walk one block, lift or carry five to seven pounds occasionally, explained she had problems bending, cannot do housework and laundry because she cannot stand, lift or hold objects, grocery shops with her husband due to difficulty concentrating and anxiety, she can do limited driving, and reports numbness in her hands and fingers. (*Id*. at 1629.) A physical examination revealed normal appearance, memory not impaired, rational thought process, satisfactory attention span, normal muscle power and tone, normal gait, difficulty squatting and walking on the heels and toes due to right ankle pain, tenderness around the right ankle and posterolaterally over the hips, trigger point tenderness on the upper and lower extremities and along the paraspinal muscles, grip strength on the right was 18 pound, grip strength on the left was 28 pounds, she was able to reach forward, push or pull, use her hands for fine coordination like tying knots, pick up coins, fasten buttons, hold pens, and fine fingering movements. (*Id*. at 1630.) Dr. Onamusi opined Snay could "sit, stand and walk frequently; bend occasionally, squat to a limited extent with support occasionally; climb steps occasionally; lift up to twenty pounds occasionally; use the upper extremities for gross and fine motor tasks low end of frequency." (*Id*.)

On September 11, 2023, Babatunde Onamusi, M.D. completed Medical Source Statement of Ability to do Work-Related Activities (Physical). (*Id*. at 1622.) Dr. Onamusi opined Snay could lift up to ten pounds occasionally, lift up to twenty pounds occasionally, and never lift over 21 pounds. (*Id*.) Dr. Onamusi found Snay could occasionally carry up to twenty pounds, and never carry more than 21 pounds. (*Id*.) Dr. Onamusi stated Snay could sit up to three hours at a time, stand and walk for fifteen minutes at a time, sit for seven hours in an eight hour work day, and stand and walk four hours in an eight hour work day; she can reach frequently, handle, finger, feel, and push or pull frequently; occasionally operate foot controls on the right, and frequently operate foot controls on the left; never climb ladders or scaffolds, crouch or crawl;

occasionally climb stairs and ramps, balance, stoop, and kneel; occasionally be exposed to unprotected heights, moving mechanical parts, operate a motor vehicle, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold and heat, and vibrations; could perform activities of daily living like shopping, travel without a companion, ambulate, prepare a simple meal, and care for her personal hygiene. (*Id*. at 1623.)

On January 4, 2024, Ndematelen Asong, PMHNP-BC completed a Medical Statement of Ability to do Work-Related Activities (Mental). (*Id*. at 1634-36.) Asong stated Snay had a mild limitation in carrying out simple instructions; a moderate limitation in understanding and remembering simple instructions and the ability to make judgments and simple work-related decisions; a marked limited in understanding and remembering complex instructions and carrying out complex instructions; and an extreme limitation in the ability to make judgments on complex work-related decisions. (*Id*. at 1634.) Asong claimed Snay had a moderate limitation in interacting appropriately with supervisors; and extreme limitations in interacting appropriately with the public, interacting appropriately with co-workers, and responding appropriately to usual work situations and to changes in a routine work setting. (*Id*. at 1635.) Asong stated Snay reported symptoms of generalized anxiety disorder, PTSD, mood disorder, and psychosis, which affects her ability to concentrate, interact with others, and stay focused. (*Id*.)

## C.    State Agency Reports

### 1.    Mental Impairments

On September 27, 2022, psychologist Irma Johnston, Psy.D., reviewed the claim file and opined that Snay had moderate limitations in interacting with others, ability to concentrate, persist, or maintain pace, and adapt or manage oneself. (*Id*. at 127.) Dr. Johnston opined Snay "can maintain attention, concentration, persistence and pace for a two to three step command without sustained fast pace" and "can interact on an infrequent, superficial level with the general public, coworkers and supervisors." (*Id*. at 130.) She found

11

Snay "can carry out tasks in settings where change is infrequent with ample time to adjust and no stringent time or production quotas in place for completion of tasks." (*Id*. at 131.)

On February 20, 2023, on reconsideration, Mary Hill, Ph.D., affirmed Dr. Johnston's findings. (*Id*. at 141.)

### 2.    Physical Impairments

On October 5, 2022, Venkatachala Sreenivas, M.D., reviewed the claim file and opined that Snay could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, unlimited push or pull with upper extremities, stand or walk about six hours in an eight hour work day, sit about six hours in an eight hour work day, occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, frequently balance, frequently stoop, and occasionally kneel, crouch, and crawl. (*Id*. at 129.) Dr. Sreenivas opined Snay had no manipulative, visual, or communicative limitations, but should avoid all exposure to hazards such as machinery and unprotected heights. (*Id*.)

On February 1, 2023, on reconsideration, Leslie Green, M.D., affirmed Dr. Sreenivas' findings. (*Id*. at 139.)

### D.    Hearing Testimony

During the July 20, 2023 hearing, Snay testified to the following:

> • She lives in a house with her husband and 16-year-old stepson. (*Id*. at 62.) She has a high school education. (*Id*. at 63.) She cannot figure out change when she pays with cash and she requires help from her husband to manage the checkbook. (*Id*. at 64.) She has a valid driver's license but has a fear of driving because she forgets where she is going. (*Id*.) She can manage her own self-care and self-hygiene. (*Id*.) She can wipe down counters and tables and cooks on occasion. (*Id*. at 68-69.) Her husband helps her cook because her hands go numb and she drops things. (*Id*. at 69.) She can broom sweep the floors. (*Id*. at 69.) Her son loads the dishwasher due to her hands and back, and her husband vacuums. (*Id*.) Her husband does the laundry. (*Id*.) She grocery shops with her husband. (*Id*.) Socially, she sees her neighbor two to three times per week, and visits her mom once or twice a month. (*Id*. at 70.) She loves music and sometimes sings karaoke with her neighbor. (*Id*.) She has three dogs and four cats that are cared for by her husband and

12

son. (*Id*. at 71.) She sometimes plays games on her phone. (*Id*. at 72.) She quit drinking two years ago and also gave up her medical marijuana card. (*Id*.)

• She can walk up and down stairs ok, but if it is more than five or six steps she struggles with her back and her hip. (*Id*. at 62.) She has bulging discs in her neck and back. (*Id*. at 65.) She has chronic pain in her hips. (*Id*.) She cannot lift heavy things because she has numbness from her elbow to her hands. (*Id*.) She hears voices and "sees things". (*Id*. at 65-66.) She has extreme anxiety, paranoia, borderline personality disorder, PTSD, and fibromyalgia. (*Id*. at 66.) Her pain is treated with medications. (*Id*.) She does not experience medication side effects. (*Id*. at 67.) Relaxing and letting her muscles decompress helps the pain. (*Id*. at 66.) She gets very stiff while sleeping, so she has a chair that she sits in. (*Id*. at 67.) She has a neck massager and foot massager that help her pain. (*Id*.) She has racing thoughts that make it difficult to concentrate and focus. (*Id*.) She had an injection in her back that helped her for about three months and then wore off. (*Id*. at 73.) She hears a voice in her head named Marsha that talks to her constantly. (*Id*. at 75.) Marsha has told her to do harmful things to herself and other people. (*Id*. at 76.)

• She estimates she can walk and stand intermittently about four to six hours a day. (*Id*. at 68.) Some days her back and hips keep her ridden to her chair, but she has "good days" three to four days per week. (*Id*.) She can sit for about an hour and a half to two hours before she needs to get up. (*Id*.) She can lift about five pounds. (*Id*.) She has trouble reaching from side to side and has trouble grasping. (*Id*. at 74.) She has difficulty fingering and cannot hold a pen, type, or use buttons. (*Id*.) She has had instances where she would stand up and everything would turn white, she couldn't see, was dizzy, and had to sit back down. (*Id*. at 75.)

• Her last job was in 2018. (*Id*. at 64.) She could no longer physically handle the job and had trouble completing paperwork. (*Id*.) She was fired for using foul language towards the plant manager when she was accused of making a major mistake that she did not do. (*Id*. at 65.)

The VE testified Snay had past work as a inventory control clerk, forklift operator, and plastic injection molder. (*Id*. at 78.) The ALJ then posed the following hypothetical question:

. . . please assume a hypothetical individual of claimant's age, education, relevant vocational background. We're going to begin at the light exertional level. She can do light work except she can occasionally climb ramps and stairs; she can never climb ladders, ropes and scaffolds; she can frequently balance and stoop, defined as bending at the waist; she can occasionally knee, crouch, defined as bending at the knees, and crawl; she is to avoid all exposure to unprotected heights and dangerous machinery; she can maintain

13

attention, concentration, persistence and pace for a two to three-step command without sustained fast pace; she can have occasional superficial contact with supervisors, co-workers, and is to have no contact with the general public. Superficial is defined as able to be in proximity of others, able to exchange greetings and able to engage in discussions that do not require persuasion or involve team or tandem tasks; she can carry out tasks and settings where changes are infrequent and with ample time to adjust with no stringent time or production quotas in place for completion of tasks, including no assembly line work; she is able to handle, finger and feel with the right dominant upper extremity frequently; she can occasionally reach overhead. Can the hypothetical individual I've just described perform any of the past work as actually performed or generally performed in the national economy?

(*Id*. at 79.) The VE testified the hypothetical individual would not be able to perform Snay's past work. (*Id*.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as a marker, classifier, and collator operator. (*Id*. at 80.) The ALJ asked, for the second hypothetical, all the same limitations but at the sedentary exertional level. (*Id*.) The VE testified the hypothetical individual would not be able to perform Snay's past work, but could perform work as a document preparer, a table worker, and an inspector. (*Id*. at 80-81.) The VE testified that being off task for twenty percent of the workday would be work preclusive. (*Id*. at 81.) The ALJ asked whether limited to occasional handling, fingering, feeling with the dominant upper extremity would be work preclusive and the VE testified that it would be. (*Id*.) The VE further testified that missing two or more days per month would be work preclusive. (*Id*.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*, 416.920(a)(4)*.  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Snay was insured on the alleged disability onset date, May 4, 2021, and remains insured through December 31, 2023, the date last insured ("DLI").  (Tr. 14.) Therefore, in order to be entitled to POD and DIB, Snay must establish a continuous twelve-month period of disability commencing between

15

these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2023.

2. The claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of May 4, 2021, through her date last insured of December 31, 2023 (20 CFR 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairments: hypertension; bilateral plantar fasciitis; residual effects status-post right ankle fracture and corrective surgery; degenerative disc disease of the lumbar spine; degenerative disc disease and mild disc bulge in the cervical spine; cubital tunnel syndrome right; fibromyalgia; post-traumatic stress disorder; anxiety; depressive disorder; unspecified psychosis; and alcohol use disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally climb ramps and stairs. She can never climb ladders ropes and scaffolds. She can frequently balance, and stoop defined as bending at the waist. She can occasionally kneel, crouch defined as bending at the knees and crawl. She is to avoid all exposure to unprotected heights and dangerous machinery. She can maintain attention, concentration, persistence and pace for a two to three step command without sustained fast pace. She can have occasional superficial contact with supervisors, coworkers, and is to have no contact the general public. Superficial is defined as able to be in proximity of others, able to exchange greetings, and able to engage in discussions that do not require persuasion or involve team or tandem tasks. She can carry out tasks in settings where changes are infrequent and with ample time to adjust with no stringent time or production quotas in place for completion of tasks, including no assembly line work. She is able to handle finger and feel with her right dominant upper extremity frequently. She can occasionally reach overhead.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

16

7. The claimant was born on April 16, 1978, and was 45 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from May 4, 2021, the amended alleged onset date, through December 31, 2023, the date last insured (20 CFR 404.1520(g)).

(Tr. 14-32.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

17

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734,

18

2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

**A.    Medical Listings.**

Snay argues remand is appropriate because the ALJ erred by failing to find Snay met the criteria of the listings and should have been found disabled at step three. (Doc. No. 7 at 20-22.) Snay contends she met the requirements of listing 12.04(A)(1) and listing 12.06(A)(1). (*Id*. at 21.) Snay states the ALJ failed to acknowledge Asong's findings of extreme limitations in two Paragraph B areas, necessitating remand. (*Id*. at 22.) Snay argues the ALJ failed to find she satisfied the requirement of extreme difficulties in adapting and managing herself, meeting the requirements of the listing. (*Id*.) Snay contends the ALJ failed to consider marked difficulties noted by Dr. Soder, which satisfy the requirements of the listing. (*Id*.)

In response, the Commissioner argues the ALJ reasonably determined she did not meet the Paragraph B criteria, finding Snay had moderate limitations in each of the four mental functioning areas. (Doc. No. 9 at 6-7.) The Commissioner states the ALJ wrote 11 consecutive paragraphs discussing evidence of Snay's mental health examinations. (*Id*. at 7.) The Commissioner contends the ALJ also considered Snay's activities of daily living to support moderate limitations, as opposed to marked or extreme. (*Id*. at 8.) The Commissioner argues the ALJ's reliance on the state agency reviewing psychologists' findings that Snay had no limitations in understanding, remembering, or applying information, and moderate limitations in interacting with others, concentrating, persisting, and maintaining pace, and adapting or managing herself constituted substantial evidence alone. (*Id*. at 8.)

"If a claimant meets or equals the requirements of a listed impairment, then the claimant is considered disabled." *Fitzenreiter v. Comm'r of Soc. Sec.*, No. 3:16 CV 2442, 2018 WL 372759, at *9 (N.D. Ohio Jan. 10, 2018), citing 20 C.F.R. §§ 416.920(d); 404.1520(d). In order to determine whether a claimant's

19

impairment meets a listing, the ALJ may consider all evidence in a claimant's record. *See* 20 C.F.R. §§ 404.1520(a)(3); 404.1526(c). A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he is disabled at Step Three of the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all the elements are satisfied. *King v. Sec'y of Health & Human Servs.,* 742 F.2d 968, 974 (6th Cir. 1984). Moreover, "[t]he burden of providing a ... record ... complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986). It is not sufficient to come close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

> To meet or equal paragraph B, an individual's mental disorder must result in an extreme limitation of one, or a marked limitation of two, of the four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.

*Milliken v. Comm'r of Soc. Sec.*, No. 3:22-CV-01219, 2023 WL 3571117, at *10 (N.D. Ohio May 3, 2023), *report and recommendation adopted,* No. 3:22 CV 1219, 2023 WL 3569072 (N.D. Ohio May 19, 2023), citing 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A)(2)(b).

The ALJ considered Snay's mental impairments at step three, writing in part:

> The severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15. In making this finding, the undersigned has considered whether the "paragraph B" criteria were satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

20

> In understanding, remembering or applying information, the claimant had a moderate limitation. In interacting with others, the claimant had a moderate limitation. With regard to concentrating, persisting or maintaining pace, the claimant had a moderate limitation. As for adapting or managing oneself, the claimant had experienced a moderate limitation.

(Tr. 16.) The ALJ went on, writing more than three single spaced pages considering evidence in the record, including an adult function report, medical treatment records, and a psychological consultative exam, consisting of both evidence of mental health challenges as well as unremarkable findings. (*Id*. at 16-19.) After weighing the evidence over the course of several pages, the ALJ wrote:

> The evidence detailed above supports that the claimant has no more than moderate limitations in understanding, remembering, and applying information, interacting with others, concentrating, persisting, and maintaining pace, and adapting and managing oneself. Because the claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied.

(*Id*. at 19.) The ALJ properly considered the evidence and found Snay had moderate limitations in each of the paragraph B areas of mental functioning. (*Id*.) While Snay would classify her impairments differently, it is not the Court's job to do so on appeal. *Ealy*, 594 F.3d at 512 ("[The] Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards."). It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here. While Snay would weigh the evidence differently, it is not for the Court to do so on appeal. There is no error.

**B.      Opinion Evidence.**

**i. Mental Opinion Evidence.**

Snay argues the ALJ erred at step three by failing to explain why the opinions of Dr. Soder and nurse Asong did not satisfy the requirements of the medical listings. (Doc. No. 7 at 10.) Snay claims the ALJ failed to apply the supportability and consistency factors, as required by the Revised Regulations, to the

opinions of Soder, Asong, and the PAMFs. (*Id*. at p. 13-16.) Snay claims the ALJ found the PAMFs generally persuasive, but did not provide analysis under the supportability and consistency factors of the Revised Regulations. (*Id*. at 13.) Snay contends the ALJ discussed her "brief periods of stability while ignoring the longitudinal evidence . . ." (*Id*. at 16.) Snay states the ALJ failed to explain how Snay's recent medical records were unsupportive of Dr. Soder's opinion, inconsistent with nurse Asong's opinion, and inconsistent with the PAMFs. (*Id*. at 18.) Snay argues the ALJ erred by relying on her activities when assessing the persuasiveness of the opinions. (*Id*. at 18-20.)

Snay contends the mental RFC is unsupported by substantial evidence because the ALJ "reject[ed]" the opinions of Dr. Soder and Ms. Asong. (Doc. No. 7 at 22.) Snay states Dr. Soder and Ms. Asong assessed Snay with additional marked limitations that support she would be off task more than ten percent of the workday and absent two days, which would be work preclusive. (*Id*. at 23.) Snay argues the "ALJ's rejection of the limitations harmed Plaintiff, and remand is required." (*Id*.)

In response, the Commissioner argues the ALJ properly explained that Dr. Soder's opinion was not supported by Snay's treatment records, including a discussion of Dr. Soder's own treatment records. (Doc. No. 9 at 9.) The Commissioner states the ALJ discussed many examinations conducted by Dr. Soder showing Snay had relatively unremarkable exams. (*Id*.) The Commissioner notes the ALJ found Dr. Soder's opinion unpersuasive because it was inconsistent with other clinical findings and Snay's activities of daily living. (*Id*. at 10.) The Commissioner argues the ALJ's evaluation of Asong's opinion was supported by substantial evidence because the ALJ determined Asong's clinical findings support moderate restrictions, instead of more extreme restrictions. (*Id*. at 11.) Further, the Commissioner contends that within the decision, the ALJ found Asong's opinion as to marked and extreme limitations inconsistent with other evidence in the record, including from other medical source providers and Snay's activities of daily living. (*Id*.)

The Commissioner contends Snay's allegation that the ALJ erred in evaluating the PAMFs should be rejected because the ALJ found the opinions generally persuasive, yet set forth a more restrictive RFC. (*Id*. at 12.) The Commissioner states courts will not fault an ALJ for finding more restrictions than the state agency reviewers opined. (*Id*., citing *Laney v. Comm'r of Soc. Sec*., No. 5:21-cv-01290, 2022 WL 2176539, at *7 (N.D. Ohio Jun. 16, 2022).

### ii. Physical Opinion Evidence.

Snay argues the physical RFC is unsupported by substantial evidence because the ALJ erred in her analysis of the opinions of Crook, Dr. Onamusi, and the PAMFs.[3] (Doc. No. 7 at 23.) Snay contends the ALJ did not apply the consistency factor of the Revised Regulations to Dr. Onamusi's opinion. (*Id*. at 23-24.) Snay states the ALJ failed to apply the supportability and consistency factors of the Revised Regulations to the opinions of providers Crook and Salerno. (*Id*. at 24.)

In response, the Commissioner contends substantial evidence supports the ALJ's analysis of Crook and Salerno's opinions. (Doc. No. 9 at 13.) The Commissioner asserts Crook and Salerno limited Snay to sedentary work, which the ALJ found only partially persuasive. (*Id*. at 13.) In making this finding, the Commissioner argues the ALJ properly found that while this result was supported by Salerno's functional evaluation, it was inconsistent with other evidence in the record. (*Id*.) The Commissioner states the ALJ properly considered other evidence of physical examinations that were generally unremarkable and properly found inconsistency with Crook and Salerno's findings of sedentary work with further fine motor restrictions, compared to the other evidence in the record. (*Id*.) The Commissioner argues the ALJ properly

---

[3] Snay's argument header claims the ALJ erred in her analysis of the PAMFs but failed to address the argument in the brief. (See Doc. No. 7 at 23-25.) This argument is therefore waived. See *Destiny Frost v. Commissioner of Social Security Administration,* No. 1:25-CV-1407, 2026 WL 607568, at *12 (N.D. Ohio Mar. 4, 2026), citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.")

23

evaluated Dr. Onamusi's opinion, finding it partially persuasive because it was consistent with and supported by the evidence of record, except for limitations with humidity ad wetness, pulmonary irritants, extreme heat and cold, and with vibrations were not supported by his own examination, nor by other treatment records. (*Id*. at 13-14.) The Commissioner states the ALJ set forth an RFC very closely resembling Dr. Onamusi's opinion, differing slightly as to her sitting limitations and ability to use foot controls, because those limitations were inconsistent with the record evidence. (*Id*. at 14.)

### iii. Legal Standard and Analysis.

Since Snay's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5)

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

24

other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

25

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed the state agency psychological consultant opinions as follows:

> The State Agency Psychological Consultant determined that the claimant had no limitations in understanding, remembering, and applying information, and moderate limitations in interacting with others, concentrating, persisting, and maintaining pace, and adapting and managing oneself. It was opined that the claimant can maintain attention, concentration, persistence and pace for a two to three step command without sustained fast pace, can interact on an infrequent, superficial level with the general public, coworkers and supervisors, and can carry out tasks in settings where change is infrequent with ample time to adjust and no stringent time or production quotas in place for completion of tasks (Ex. C4A). Upon reconsideration, State Agency Psychological Consultant determined that the claimant had no limitations in understanding, remembering, and applying information, and moderate limitations in interacting with others, concentrating, persisting, and maintaining pace, and adapting and managing oneself. It was opined that the claimant can maintain attention, concentration, persistence and pace for a two to three step command without sustained fast pace, can interact on an infrequent, superficial level with the general public, coworkers and supervisors, and can carry out tasks in settings where change is infrequent with ample time to adjust and no stringent time or production quotas in place for completion of tasks (Ex. C6A). These opinions are generally persuasive because they are relatively consistent with the claimant's activities of daily living and the recent clinical findings. To give the claimant the full benefit of the doubt, the undersigned also found moderate limitations in understanding, remembering, and applying information, which is more than the State Agency Psychological Consultants opined. Likewise, while similar, the actual limitations in the claimant's residual functional capacity were reworded or modified to be more vocationally relevant. Overall, the clinical findings support these opinioned [*sic*]. For example, on January 4, 2024, the claimant noted she is able to bathe, dress, shop, and clean on her own sometimes, but noted that she receives help from her husband when needed. On exam, the claimant was well groomed, her hygiene was good, she did

> not exhibit any psychomotor agitation or retardation, she was dressed appropriately for weather, and she was cooperative throughout the exam. The claimant did not give any statements that seemed misleading or inappropriate, she described her mood as "always all over the place" and stated that her current mood was anxious. This was incongruent with her affect which is flat. The claimant alleged delusion, auditory or visual hallucinations, paranoia, and a history of suicidal ideation with no current plan or intent. She had no homicidal thoughts, her stream of mental activity was linear, goal directed, and her speech was normal. She was alert and oriented times 2 to person and place and she had poor judgment, but good insight into their condition (Ex. C12F).

(Tr. 27.) Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. § 404.1520c(a).  The ALJ considered the supportability and consistency of the state agency psychological consultant opinions, discussing both the findings at the initial level and upon reconsideration. (Tr. 27.) The ALJ also discussed how the opinions were "relatively consistent with the claimant's activities of daily living and the recent clinical findings." (*Id*.) The ALJ expressly noted Snay's purported hallucinations as well as unremarkable findings. (*Id*.) Moreover, the ALJ found the opinions generally persuasive and yet imposed a more restrictive RFC than the state agency psychological consultants to "give the claimant the full benefit of the doubt." (*Id*.) *See Laney*, 2022 WL 2176539, at *7. The ALJ properly considered the supportability and consistency factors when analyzing the state agency psychological consultant opinions. There is no error.

The ALJ analyzed Dr. Soder's opinion as follows:

> On April 3, 2023, A. Soder, MD, opined that the claimant had extreme limitations in interacting with others and adapting, managing oneself, and responding appropriately to changes in the work setting, marked limitations in understanding, remembering, and applying information, concentrating, persisting, and maintaining pace, remember locations and work-like procedures, completed a normal 8-hour workday without interruptions, and get along with coworkers and peers without distracting them, and moderate limitations in carrying out very short or simple instructions. It was further opined that the claimant would miss four or more days of work per month (Ex. C7F). These opinions are not persuasive because they are completely inconsistent with the clinical findings during the consultative exams. For example, on January 4, 2024, the claimant noted she is able to bathe, dress,

27

shop, and clean on her own sometimes, but noted that she receives help from her husband when needed. on exam, the claimant was well groomed, her hygiene was good, she did not exhibit any psychomotor agitation or retardation, she was dressed appropriately for weather, and she was cooperative throughout the exam. The claimant did not give any statements that seemed misleading or inappropriate, she described her mood as "always all over the place" and stated that her current mood was anxious. This was incongruent with her affect which is flat. The claimant alleged delusion, auditory or visual hallucinations, paranoia, and a history of suicidal ideation with no current plan or intent. She had no homicidal thoughts, her stream of mental activity was linear, goal directed, and her speech was normal. She was alert and oriented times 2 to person and place and she had poor judgment, but good insight into their condition (Ex. C12F). They are also not supported by the claimant's treatment records. In fact, as of June 2023, the claimant was alert and oriented x3, her affect and mood were normal, her thought process was normal without evidence of depression or psychosis, she had good insight and appropriate interaction, and her cognition and memory appeared to be intact (Ex. C10F). Therefore, none of the opinions from A. Soder, MD, were adopted because they are completely inconsistent with the evidence, which supports no more than moderate mental work-related restrictions.

(Tr. 28.) The ALJ considered the supportability and consistency of Dr. Soder's opinions, discussing how the opinions are inconsistent with the clinical findings during the consultative exams which noted some of Snay's activities, her ability to care for herself, her mood and affect, purported hallucinations, linear thoughts process, poor judgment, and good insight. (*Id*.) The ALJ further explained that the opinions were not supported by the treatment records, which reflect that she was alert and oriented, had normal mood and affect, had normal thought process without evidence of depression, and had good insight. (*Id*.) The ALJ found Dr. Soder's opinions not persuasive. (*Id*.) It is the ALJ's job to weigh the evidence, and she did so here. There is no error.

The ALJ analyzed Asong's opinion as follows:

On January 4, 2024, consultative examiner, N. Asong, NP, opined that the claimant can understand, does not remember, can carry out instructions and follow a conversation. The claimant's ability to reason mildly limited. The claimant's abstract thinking and reasoning displayed mild limitations when asked to interpret proverbs. Their judgment and insight showed extreme limitations when asked how they would respond to smoke in a crowded

28

theater. The claimant's short-term memory was intact as evidenced by 3 out of 3 words recalled immediately and 5 out of 5 digits forward immediately. The claimant's long-term memory was mildly limited as evidenced by the recall of 1 out of 3 words after 5 minutes and was able to recall a past event or memory. Mental flexibility was mildly limited as evidenced by recall 2 out of 5 numbers on digit span backward. spelling "world" forward correctly, spelling "world" backwards exhibiting a 3 fund of knowledge answering 3 out of 4 questions correctly on fund of knowledge. The claimant was able to sustain concentration and show persistence with simple tasks for a short period of time and the claimant was able to sustain concentration and show persistence with multi step tasks for a short period of time and the claimant displayed mild limitations when calculating serials. The claimant has limited social interactions, mostly with her family and a friend. The claimant reports difficulty with social interactions in the past because was unable to go out and meet people. In the past the claimant has interacted well with co-workers and supervisors although she had difficulty being around people and isolated herself at work and no friends. The claimant's ability to adapt is taking time to perform tasks (Ex. C12F). These opinions are only slightly persuasive because while generally consistent with the moderate mental limitations detailed in the residual functional capacity, many opinions from N. Asong, NP, did not provide specific and vocationally relevant work-related restrictions. Instead, her statements focused on the claimant's allegations and the clinical findings. Nevertheless, the clinical findings during the consultative exam support the moderate restrictions opined by N. Asong, NP. Specifically, on exam, the claimant was well groomed, her hygiene was good, she did not exhibit any psychomotor agitation or retardation, she was dressed appropriately for weather, and she was cooperative throughout the exam. The claimant did not give any statements that seemed misleading or inappropriate, she described her mood as "always all over the place" and stated that her current mood was anxious. This was incongruent with her affect which is flat. The claimant alleged delusion, auditory or visual hallucinations, paranoia, and a history of suicidal ideation with no current plan or intent. She had no homicidal thoughts, her stream of mental activity was linear, goal directed, and her speech was normal. She was alert and oriented times 2 to person and place and she had poor judgment, but good insight into their condition (Ex. C12F). Likewise, the claimant's activities of daily living are consistent with the limitations opined by N. Asong, NP. For example, the claimant acknowledged that she is able to feed her pets, she is able to act as her uncle's payee for the Social Security Administration, including managing his grocery money and paying his bills, and she is able to shower, brush her hair, shave, feed herself, and use the toilet independently. Moreover, she acknowledged that she prepares meals weekly, she is able to wipe down counters and do laundry, she enjoys watching television, being outside, and swimming, she spends time with others, she can go out alone, she is able to drive a car, she shops in stores for clothes, household items, and gifts, she

29

> can pay bills, count changes, and handle bank accounts, and she finishes what she starts (Ex. C5E).

(Tr. 29-30.) The ALJ considered the supportability and consistency of Asong's opinions, discussing findings showing mild limitations in ability to reason and think abstractly, extreme limitations in judgment and insight, mild limitations in mental flexibility, intact short-term memory and mildly limited long-term memory, ability to concentrate for a short period of time, and limited social interactions. (*Id*.) The ALJ noted clinical exam findings support the moderate restrictions opined by Asong, including good hygiene and proper dress, anxious mood contrasted with flat affect, hallucinations, no homicidal thoughts, linear thoughts, goal directed, poor judgment, and good insight. (*Id*. at 30.) The ALJ explained the moderate limitations opined by Asong were consistent with Snay's activities of daily living, including her ability to feed her pets, manage her uncle's funds for him, care for herself, prepare meals, watch television, wipe down counters, and do laundry, among other tasks. (*Id*.) The ALJ found Asong's opinions slightly persuasive because they were consistent with moderate restrictions, but "many opinions from N. Asong, NP, did not provide specific and vocationally relevant work-related restrictions." (*Id*.) Here, the ALJ considered the supportability and consistency of Asong's opinions. There is no error.

The ALJ analyzed Dr. Onamusi's opinion as follows:

> In August 2023, consultative examiner, B. Onamusi, MD, opined that the claimant could lift and carry up to 20 pounds occasionally, she could sit for a total of 7 hours in a workday, she could stand or walk for 4 hours each in a workday, she did not require a cane to ambulate, she could frequently reach, handle, finger, feel, push, and pull, she could occasionally use right foot controls and frequently use left foot controls, she should never climb of ladders, ropes, or scaffold, crouch, or crawl, she could occasionally climb ramps and stairs, balance, stoop, and kneel, she can handle a loud work environment, she can have occasionally work at unprotected heights, with moving machinery, with humidity and wetness, with pulmonary irritants, in extreme heat and cold, and with vibrations, and she can occasionally operate a motor vehicle. He further opined that the claimant is able to sit, stand and walk frequently; bend occasionally, squat to a limited extent with support occasionally; climb steps occasionally; lift up to twenty pounds occasionally; and use the upper extremities for gross and fine motor tasks

30

at the low end of frequently (Ex. C11F). These opinions are partially persuasive because most of the limitations opined by B. Onamusi, MD, are consistent with the claimant's clinical findings during the consultative exam. However, the multiple environmental limitations are not supported by the treatment records. In fact, the claimant has not alleged any significant limitations with humidity wetness, pulmonary irritants, heat, cold, or vibrations. Likewise, the claimant noted that she can operate a motor vehicle. As such, these additional limitations were not adopted. Nevertheless, the claimant's postural limitations and exertional limitations are essentially consistent with the opinions of B. Onamusi, MD. The clinical findings support these opinions. For example, her cranial nerves were intact, her muscle power and tone were normal in all muscle groups, her reflexes in the ankles, knees, elbows and wrists were 2+ and symmetrical, her ankle clonus was absent, her Babinski sign was negative, bilaterally, her sensation to light touch and pain was preserved in all extremities, and her vibration sense and proprioception was intact in all extremities. Her Romberg sign was negative and there were no cerebellar or extrapyramidal signs, she had no pedal edema, and her peripheral pulses were not diminished. She walked with a normal gait, she had no trouble transferring onto or off the examination table, and she did not require an assistive device for ambulation or transfer, but she had difficulty squatting and walking on the heels and on the toes due to pain in the right ankle. There was moderate tenderness around the lateral aspect of the right ankle and posterolaterally over the hips. There were areas of trigger point tenderness on the upper and lower extremities as well as along the paraspinal muscles. Examination of the neck and back revealed a symmetrical spine. There was no muscle spasm. She had a negative spurling maneuver and negative straight leg raise bilaterally. She was able to grip and grasp with both hands. She was able to reach forward, push or pull with the upper extremities. She was able to use the hands for fine coordination and manipulative tasks; she was able to tie knots, do buttons, do shoelaces, pick up coins, hold pens, turn door handles, pull zippers and do fine fingering movements (Ex. C11F).

(Tr. 29.) The ALJ considered the supportability and consistency of Dr. Onamusi's opinions, discussing that most of the limitations discussed are consistent with his findings during the consultative exam, but the environmental limitations are not supported by the treatment records. (*Id*.) The ALJ noted the postural and exertional limitations were essentially consistent with clinical findings, noting several specific examples. (*Id*.) The ALJ discussed both Dr. Onamusi's own findings as well as well as consistency with other clinical records. There is no error.

The ALJ analyzed Crook and Salerno's opinions as follows:

31

> On January 5, 2023, the claimant attended a functional capacity evaluation. Based on her performance during the exam, it was opined that the claimant should be limited to sedentary work with decreased dexterity for completing fine motor tasks and difficulty with gross motor activities due to increased pain. It was noted that the claimant can exerting up to ten pounds of force occasionally and/or negligible amount of force frequently to lift, push, carry, pull or otherwise move objects, including human body (Ex. C4F). These opinions are partially persuasive because they identify the areas in which the claimant is limited and because they are consistent with the claimant's effort during the functional capacity exam. However, based on the more recent clinical findings, the treatment notes do not support the restriction to less than the full range of sedentary work. For example, in June 2023, the claimant's head, eyes, neck, chest, cardiovascular, abdomen, extremities, musculoskeletal, psychological, skin, and lymph node exams were unremarkable. In fact, she was alert and oriented x3, she had no cyanosis, clubbing, edema, joint swelling, or gross deformity, and she had 5/5 strength globally and symmetrically, (Ex. C10F). Likewise, her activities of daily living are consistent with more than sedentary work. Specifically, she acknowledged she is able to feed her pets, she is able to act as her uncle's payee for the Social Security Administration, including managing his grocery money and paying his bills, and she is able to shower, brush her hair, shave, feed herself, and use the toilet independently. Moreover, she acknowledged that she prepares meals weekly, she is able to wipe down counters and do laundry, she enjoys watching television, being outside, and swimming, she spends time with others, she can go out alone, she is able to drive a car, she shops in stores for clothes, household items, and gifts, she can pay bills, count changes, and handle bank accounts, and she finishes what she starts (Ex. C5E).

(Tr. 28-29.) The ALJ considered the supportability and consistency of Crook and Salerno's opinions, discussing that the opinions are partially persuasive because areas in which Snay is limited and are consistent with Snay's effort during the functional capacity exam. (*Id*. at 28.) The ALJ noted in detail, however, that recent treatment notes do not support less than sedentary work. (*Id*.) Further, the ALJ discussed Snay's activities of daily living, explaining how they are inconsistent with the restriction to less than sedentary work. (*Id*.) Here, the ALJ properly discussed both the supportability and consistency of the opinions and weighed the evidence as required. There is no error.

Snay argues the ALJ erred by relying on Snay's activities of daily living. (Doc. No. 7 at 18.) The ALJ considered Snay's ability to perform activities of daily living as one factor in her analysis. *See Stark v.*

32

*Comm'r of Soc. Sec.*, No. 5:17 CV 2187, 2019 WL 400606, at *10 (N.D. Ohio Jan. 31, 2019) ("Daily activities are a factor to be considered in assessing a claimant's subjective symptom reports. . . . The Appeals Council did not equate these activities alone with the ability to perform full-time work, but rather considered them as one factor in evaluating Plaintiff's subjective complaints.") (internal citations omitted.) The ALJ's consideration of the entire record, including activities of daily living is proper. There is no error.

The ALJ properly evaluated the opinion evidence, considering both the supportability and consistency of the opinions. The RFC is supported by substantial evidence. It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here. The findings of the Commissioner are not subject to reversal merely because there is evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73. While Snay would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: March 17, 2026

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**

33